Maurice B. VerStandig, Esq.
Bar No.: MD18071
THE BELMONT FIRM
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Phone: (202) 991-1101
E-Mail: mac@dcbankruptcy.com
*Counsel for the Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re: | Case No.: 22-238-ELG |
| Muse Threads, Inc., | Chapter 11 (Subchapter V) |
| Debtor. | |
| _____/ | |
| Muse Threads, Inc. | Case No.: 23-10037-ELG |
| Plaintiff, | |
| v. | |
| 8fig, Inc. | |
| and | |
| Alien Finance LLC | |
| Defendants | |
| _____/ | |

**COMPLAINT**

Comes now Muse Threads, Inc. ("Muse Threads" or the "Debtor"), by and through

undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 7003, and as and for its

adversary complaint against 8fig, Inc. ("8fig") and Alien Finance LLC ("Alien Finance")

(collectively, the "Defendants," and each a "Defendant") states as follows:

1

**Introduction**

1.       This adversary proceeding concerns two related series of events that, in turn, invite vastly different legal ramifications. A textbook fraudulent conveyance invited a prepetition debt that seeks to be avoided herein but, in a stunning series of events, the counterparty to that putative obligation then undertook – in concert with a debt collector – a particularly abrasive scheme to collect the subject debt, roughly eight months post-petition, in wanton, willful, and egregious violation of Section 362 of Title 11 of the United States Code (the "Automatic Stay"). This case is aimed at addressing both the fraudulent conveyance and the subsequent stay violations.

2.       8fig is in the business of furnishing consumer-facing companies with so-called "merchant cash advances" ("MCAs") – a variety of commercial funding that has come into vogue of late, proving every bit as toxic to small businesses as so-called payday loans have become to consumers.

3.       The theory of an MCA is relatively simple: the funds being tendered to a small business are not a loan (which would implicate uncomfortable questions about the application of various states' usury laws) but, rather, the proceeds of an advanced purchase of future receivables.

4.       An MCA has nearly every optical resemblance to a loan – including in many cases (such as the one *sub judice*) a security agreement – but, per the governing document's express terms, is instead characterized as a simple sales transaction.

5.       Notably, MCA agreements are akin to factoring agreements only insofar as community banks are akin to loan sharks; the premium charged under MCA contracts dwarfs that of traditional factors, while MCA agreements seek to impact *all* future receivables of a company in contrast to the sale of specifically-identified (and contemporaneously extant) receivables that ordinarily underlies a factoring agreement.

6.      Too often, the only way for a small business to survive the repayment rigors of an

MCA agreement is to enter into a new MCA agreement, just as consumers take out one payday

loan to satisfy the obligations attendant to the last payday loan; increasingly, the oft-vicious cycle

of MCA debt is driving small businesses to seek relief under Title 11 of the United States Code,

and such is very much what happened here.

7.      Complicating matters, however, the MCA transaction between 8fig and Muse

Threads was only the first concerning interaction between the parties; nearly eight months *after*

this bankruptcy was filed, and after 8fig had actively participated in the case, 8fig – seemingly in

concert with its chosen debt collector, Alien Finance – undertook a scheme to (i) record a UCC

lien against the Debtor's assets; (ii) contact Stripe, Inc. ("Stripe"), the online payment processor

used in the Debtor's Shopify, Inc. ("Shopify") store; (iii) demand that Stripe pay over to Alien

Finance all monies due and owing to the Debtor; and (iv) effectuate a *de facto* freeze of the

Debtor's cash flow while a resultant "hold" was put on Muse Threads' Shopify account for some

31 days.

8.      This clear violation of the Automatic Stay had a profound impact on Muse Threads;

a proverbial "ma and pa" merchant spent weeks sending e-mails – and making phone calls – to its

payment processor, trying to get ahold of persons at Shopify, endeavoring to figure out why its

revenues were frozen, and fretting over a rapidly-depleting operating account. These efforts came

at the expense of fulfilling customers' orders and promptly answering customers' inquiries,

inviting a precipitous decline in goodwill, a palpable diminution in repeat customers, and an array

of unflattering online reviews.

9.      Muse Threads has not yet recovered from these harms. Steep marketplace discounts

permitted the Debtor a robust Black Friday, but sales numbers are markedly down for the months

3

of September, October, and November, with Muse Threads – an entity that was astonishingly good at making and meeting projections, with a *de minimis* standard deviation, during the life of its stay in Chapter 11 – now seeing a potentially-fatal downward departure from those same numbers.

10.    It is not entirely clear if Muse Threads will be able to survive the damages that have been incurred by the Automatic Stay violations complained of herein. The entity is trying to cut expenses, run bargain-basement promotions, and regain customers' loyalty and adoration, but any candid assessment necessarily reveals that the Debtor's odds of post-confirmation survival closely resemble those imprinted on tote boards the nation over; there is a very real chance of Muse Threads not making it across a finish line that, just a few months ago, the Debtor was all-but-certain to cross with ample economic room to spare.

## Parties

11.    Muse Threads is a corporation organized pursuant to the laws of the District of Columbia, primarily engaged in the online sale of printed clothing made from bamboo. Muse Threads is the debtor herein, having petitioned for bankruptcy relief on December 23, 2022.

12.    8fig is a Delaware corporation with its principal place of business in the State of Texas.

13.    Alien Finance is a limited liability company formed pursuant to the laws of the State of Wyoming, with its principal place of business also being in Wyoming.

## Jurisdiction and Venue

14.    This Honorable Court enjoys jurisdiction over the instant proceeding, pursuant to the allowances of Section 157(b)(2)(A, H, O) of Title 28 of the United States Code, as this case concerns the administration of the Debtor's estate, an effort to recover a fraudulent conveyance, and the adjustment of the debtor-creditor relationship.

15.     Venue is properly laid in this Honorable Court pursuant to the allowances of

Section 1334 of Title 28 of the United States Code, as this matter relates to a proceeding under

Title 11 of the United States Code.

**General Allegations: The Merchant Cash Advance**

16.     On or about October 25, 2022, 8fig and the Debtor entered into a "Master Future

Revenue Purchase Agreement" (the "Master Agreement," a copy of which is attached hereto as

Exhibit A), whereby 8fig agreed to consider purchasing a portion of Muse Threads' future sales

upon terms to be established in subsequent documentation.

17.     The Master Agreement is express that the contemplated purchase of future sales "is

not a loan," noting that "[i]nstead, We purchase a set amount of the revenue You received from

Your future sales of the inventory We finance," before later asserting "the transaction is intended

as a sale and not as security for a loan."

18.     At some subsequent juncture in time, not later than November 3, 2022, 8fig and the

Debtor entered into a transaction, pursuant to the Master Agreement, whereby 8fig would provide

the Debtor with monies over a series of months and the Debtor, in turn, would remit various sums

of future sales to 8fig.

19.     When the Debtor sought bankruptcy relief on December 23, 2022, Muse Threads

had received a total of $45,000.00 from 8fig (though 8fig would, seemingly inadvertently, send

another $30,000.00 to the Debtor post-petition, with those funds then being held by the Debtor for

the benefit of 8fig and subsequently returned to 8fig pursuant to a confirmed plan of

reorganization).

20.     Based on this $45,000.00 in advanced monies, 8fig would assert – pursuant to its

agreement with the Debtor – an entitlement to collect $87,695.05 in future receivables, as noted in

5

the proof of claim 8fig caused to be filed in this case. *See* Proof of Claim, attached hereto as Exhibit

B.

21.     The same proof of claim would also evidence that based on the $45,000.00 given

pre-petition – and the $30,000.00 mistakenly disbursed post-petition – 8fig maintained the Debtor

to have "pledged" $557,509.47 in "security."

22.     It thusly appears that 8fig acquired $87,695.05 in future receivables from the

Debtor, in exchange for a cash disbursement of $45,000.00; if this transaction were a loan (and

8fig clearly states the transaction is not, in the Master Agreement), the lifetime interest rate on the

funds advanced would be 94.8%.

23.     The Debtor entered into this transaction with 8fig, in October or November 2022,

because the Debtor was unable to pay its various obligations as they came due and, resultantly,

needed funds.

**General Allegations: Automatic Stay Violations**

24.     When the Debtor sought bankruptcy relief on December 23, 2022, Muse Threads

scheduled 8fig as a creditor holding an undisputed claim of $30,000.00, with said claim being in

seventh priority position against the Debtor's assets.

25.     8fig was listed on the original mailing matrix in this case, on account of having

been scheduled as a creditor, at the address listed on the Master Agreement.

26.     On March 2, 2023, 8fig filed a proof of claim in the Debtor's bankruptcy case.

27.     On March 10, 2023, counsel for 8fig entered an appearance in the Debtor's

bankruptcy case.

28.     Accordingly, from December 2022 onward, 8fig was on constructive notice that Muse Threads was a debtor in bankruptcy, with 8fig then being on actual notice of the same from a date not later than March 2, 2023.

29.     More than four months after being on actual notice of the bankruptcy, however, 8fig recorded a UCC Financing Statement, against Muse Threads, in the District of Columbia, on July 19, 2023 (the "UCC Financing Statement," a copy of which is attached hereto as Exhibit C).

30.     Peculiarly, the UCC Financing Statement does not list any collateral whatsoever.

31.     Shortly thereafter, on July 24, 2023, Alien Finance wrote to Stripe to give "notification that [Muse Threads] is in material breach of" its financing agreement with 8fig and that "[a]ll of the obligations of Stripe, Inc. to [Muse Threads] have been assigned to [8fig], as evidenced by the attached UCC Financing Statement." *See* Alien Finance Letter, attached hereto as Exhibit D.

32.     The Alien Finance Letter continued, *inter alia*, "payment on all obligations to [Muse Threads] under its Stripe, Inc. account are to be frozen," thereafter indicating a balance of $113,334.43 to be owed to 8fig. For good measure, the missive continued, *inter alia*, "[p]lease be advised, in accordance with the Uniform Commercial Code, failure to pay in accordance with these instructions could subject you to liability for double payment."

33.     Following receipt of the letter, in or about late August 2023, Stripe did precisely as commanded by Alien Finance, on behalf of 8fig, and froze all monies otherwise disbursable to Muse Threads.

34.     The Debtor's operating principal, John Mark King ("Mr. King"), then spent the better part of several weeks trying to understand why the company's revenues were being held up, initially believing there to be an issue with a Shopify account before ultimately gleaning the

7

problem to lay with Stripe. Ultimately, 31 days would pass in which the Debtor did not have access to its own sales revenues.

35.     Shopify and Stripe are both predominately internet-based entities, and rather large ones at that; Mr. King spent dozens upon dozens of hours trying to reach out to these firms, waiting on hold, sending e-mails, endeavoring to ascertain why Muse Threads' monies were frozen, and desperately pleading to have the funds released.

36.     While Mr. King was endeavoring to garner a release of his and his wife's company's revenues, he was not doing what he normally does: interacting with customers, fulfilling orders, shipping packages, and carrying on the ordinary affairs of running a small merchant business.

37.     These existential distractions and delays had a profound impact on Muse Threads' customer service; a normal "days to delivery" metric (used to measure the time from which an item is ordered until the time at which it reaches a customer's doorstep) swelled from 6.5 in August 2023 to 13.8 in September 2023. With time being commanded to then clear out an ever-growing backlog, the number only began to subside to 10.3 in October 2023, though it has since returned to 6.7 for November 2023.

38.     The corrosive effect of delayed delivered and delayed customer service responses was quickly felt. Muse Threads had a history of cannily-accurate revenue projections; the entity projected earnings of just over $83k in May 2023 and made slightly more than $92k, with a projection of just over $88k in June 2023 met with revenues of more than $93k, followed by a projection of $100,718.00 in July 2023 contrasting to a performance of $99,375.10. Yet the correlation between projections and revenues was reduced to a parody by August 2023.

39.     For August 2023, Muse Threads projected $110,367.00 in revenue, ultimately earning only $80,927.55. The next month, a projection of $99,544.00 in earnings was met with a performance of $82,396.68. And in October 2023, the decline continued, with a projection of $110,494.00 being paired with a meager showing of $67,717.07.

40.     It is a known fact that all persons who confuse correlation with causation end up dying, but the foregoing numbers appear to be well rooted in a decline in purchases from repeat customers whose August 2023 and September 2023 deliveries were delayed while Mr. King endeavored to address the wholesale economic freeze brought about by 8fig and Alien Finance.

41.     On September 13, 2023, with Mr. King having finally made headway into discovering the issue, and with some certainty that either Stripe or Shopify was withholding the Debtor's monies, undersigned counsel made a demand on both companies. *See* Demand Letter, attached hereto as Exhibit E.

42.     Stripe turned out to be an upstanding corporate citizen once made aware of the situation; within 48 hours of receiving the Demand Letter, Stripe's outside counsel at DLA Piper contacted Muse Threads' general reorganization counsel. Following an exchange of information and documents, various Stripe personnel worked after hours to ensure the freeze was quickly lifted and the monies disbursed to Muse Threads.

43.     At this point, however, the damage had been done; not only did Muse Threads incur attorneys' fees picking up on Mr. King's efforts and making a demand on Stripe but, far worse, once Mr. King was able to refocus on the day-to-day affairs of his business, he found himself staring down a large backlog of delayed orders, an ever-growing queue of disappointed customer questions, and a series of negative online reviews.

44.     The Debtor operates on tight margins, as is fairly common for small businesses; the cost of acquiring a customer is high and the cost of acquiring a loyal repeat customer is even higher. As of the filing of this complaint, Muse Threads still does not know the full extent of the economic damages occasioned by 8fig and Alien Finance violating the Automatic Stay; a best guess is that it will take approximately $100,000.00 for the Debtor to regain the functional equivalent of lost customers, to move garner sufficient positive reviews to mute the impact of negative reviews forever emblazoned upon the internet, and to operate at a loss while so doing. But that number could end up being low; more data will need to be collected in the coming months, as customers are given opportunities to look past their subpar encounters and as new consumers discover the wonders of a truly splendid small business that sells amazing attractive and comfortable family clothing.

45.     Adding proverbial insult to injury, as this Complaint was being drafted, 8fig reached out to the Debtor once more, sending a collection e-mail on December 21, 2023; even after all of the foregoing, it seems 8fig remains either unwilling – or incapable – of adhering to the Automatic Stay. *See* Collection E-mail, attached hereto as Exhibit F.

### Count I – Fraudulent Conveyance (11 U.S.C. § 548)

46.     Muse Threads repeats and realleges each and every foregoing paragraph of this Complaint, as though fully set forth herein.

47.     In paying $45,000.00 for the acquisition of $87,695.05 in future revenues of the Debtor, 8fig did not afford reasonably equivalent value to Muse Threads.

48.     Specifically, since 8fig was not purchasing any identified receivable or collection of receivables but, rather, a portion of *all* future receivables of the Debtor, 8fig did not undertake any cognizable risk of the Debtor's customers not paying their correlative obligations.

49.     Indeed, since the Debtor is an online retailer, and its "receivables" are comprised of the funding of credit card payments tendered by purchasers, 8fig did not undertake any cognizable risk of the Debtor not collecting the promised receivables.

50.     This accordingly created a paradigm where 8fig was not purchasing risk or offering a modestly-discounted purchase price for future revenues so as to account for the net present value of money; this was, rather, a situation whereby 8fig was purchasing an assured sum of $87,695.05 for just over 51 cents on the dollar.

51.     At the time of entering into this transaction, Muse Threads was unable to pay its debts as they came due (hence the need to obtain money from 8fig).

WHEREFORE, Muse Threads respectfully prays this Honorable Court (i) avoid the Debtor's obligations to 8fig pursuant to the Master Agreement and any transactions entered into pursuant to the Master Agreement; (ii) avoid the UCC-1 filing of 8fig together with any other security interest, perfected or inchoate, of 8fig; and (iii) afford such other and further relief as may be just and proper.

### Count II – D.C. Code § 28-3101, *et seq.*

52.     Muse Threads repeats and realleges each and every foregoing paragraph of this Complaint, as though fully set forth herein.

53.     Muse Threads was presumptively insolvent, within the definition afforded by Section 28-3102(b) of the District of Columbia Code, at the time Muse Threads entered into the Master Agreement with 8fig.

WHEREFORE, Muse Threads respectfully prays this Honorable Court (i) avoid the Debtor's obligations under the Master Agreement, pursuant to Section 544 of Title 11 of the United States Code and Section 28-3107(a) of the District of Columbia Code; (ii) avoid the Debtor's

obligations under the Agreement, pursuant to Section 544 of Title 11 of the United States Code

and Section 28-3105 of the District of Columbia Code; (iii) avoid the UCC-1 filing of 8fig together

with any other security interest, perfected or inchoate, of BNL, pursuant to Section 544 of Title 11

of the United States Code and 28-3107(a) of the District of Columbia Code; and (iv) afford such

other and further relief as may be just and proper.

<strong>Count III – Violation of the Automatic Stay (11 U.S.C. § 362)</strong>

54.     Muse Threads repeats and realleges each and every foregoing paragraph of this

Complaint, as though fully set forth herein.

55.     By endeavoring to garnish the credit card proceeds of Muse Threads' sales, post-

petition, 8fig and Alien Finance undertook an "act to … exercise control over property of the

estate," in contravention of Section 362 of Title 11 of the United States Code.

56.     By endeavoring to garnish the credit card proceeds of Muse Threads' sales, post-

petition, 8fig and Alien Finance undertook an act to "perfect, or enforce against property of the

debtor [a] lien to the extent that such lien secures a claim that arose before the commencement of

the case" at bar, in contravention of Section 362 of Title 11 of the United States Code.

57.     8fig was actual constructive notice of this bankruptcy proceeding at the time it

endeavored to garnish the credit card proceeds of Muse Threads' sales, with Alien Finance being

equally on notice as the agent of 8fig.

58.     The Debtor has suffered actual damages as a result of this violation of Section 362

of Title 11 of the United States Code.

59.     WHEREFORE, Muse Threads respectfully prays this Honorable Court (i) enter

judgment against 8fig and Alien Finance, jointly and severally, and in favor of Muse Threads, in

a sum equal to the damages sustained by Muse Threads on account of 8fig and Alien Finance's

violations of Section 362 of Title 11 of the United States Code; and (ii) afford such other and

further relief as may be just and proper.

Respectfully submitted,

Dated: December 28, 2023        By:     /s/ Maurice B. VerStandig
                                        Maurice B. VerStandig, Esq.
                                        Bar No. MD18071
                                        The Belmont Firm
                                        1050 Connecticut Avenue, NW, Suite 500
                                        Washington, DC 20036
                                        Phone: (202) 991-1101
                                        mac@dcbankruptcy.com
                                        *Counsel for the Debtor*